IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KENNETH SCOTT RODGERS,

          Petitioner,

     vs.

D. K. SISTO, Warden, California State
Prison, Solano,

          Respondent.

No. 2:07-cv-02383-JKS

MEMORANDUM DECISION

Kenneth Scott Rodgers, a state prisoner appearing *pro se*, has filed a Petition for Habeas Corpus Relief under 28 U.S.C. § 2254.  Rodgers is presently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California State Prison, Solano. Respondent ("State") has answered the petition, and Rodgers has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In April 1994 Rodgers was convicted on a guilty plea in the Riverside County Superior Court of Murder in the Second Degree (Cal. Penal Code, § 187), with a firearms use enhancement (Cal. Penal Code, § 12202.5).  The trial court sentenced Rodgers to an indeterminate term of 15 years to life on the murder conviction and a consecutive term of 3 years on the firearm use enhancement conviction, for an aggregate term of 18 years to life.  Rodgers does not challenge his conviction or sentence in this proceeding.

In February 2007 Rodgers appeared at a parole-suitability hearing before the Board of Parole Hearings.  The Board denied Rodgers parole for a period of three years.  Rodgers filed a

timely petition for habeas corpus relief in the Riverside County Superior Court, which denied his

petition in an unpublished reasoned decision.  The California Court of Appeal, Fourth District,

summarily denied Rodgers's petition to that court without opinion or citation to authority.  The

California Supreme Court summarily denied review without opinion or citation to authority on

October 24, 2007.  Rodgers timely filed his petition for relief in this Court on November 4, 2007.

The facts of the underlying commitment offense as set forth in the Probation Officer's

report and recited by the Board are:

> "On November 29th, 1992, at approximately two a.m., investigator
> Humphries of the Riverside County Sheriff's Department was dispatched to 66860
> Florida Street in Desert Hot Springs regarding a shooting.  Deputy Trevino and
> Weems, W-E-E-M-S, were already at the scene.  They told investigator
> Humphries the victim, Rochelle Rodgers, had been shot and had died en route to
> Desert Hospital.  Investigator Humphries learned during his subsequent
> investigation that the victim and her husband, the inmate, had been separated for
> about one and a half months.  The night of the shooting the victim had gotten off
> work at approximately ten p.m. and had gone to her home, her brother's residence,
> which she had been staying.  Later, in the early morning hours, she went to a
> friend's home at 66860 Florida Street.  She was followed there by the inmate who
> subsequently shot and killed her while she sat her in [*sic*] vehicle in the driveway
> at that residence.  A witness identified the inmate as the person who had done the
> shooting.  The inmate fled the scene in a vehicle."[1]

## II.  GROUNDS RAISED/DEFENSES

Rodgers raises two grounds for relief:  (1) denial of parole violated the plea agreement;

and (2) denial of parole was not based upon relevant reliable evidence.  The State does not raise

any affirmative defense.[2]

---

[1] Docket No. 13-3, pp. 74-75.

[2] *See* Rules—Section 2254 Cases, Rule 5(b).

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in §

2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time

of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the

states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

---

[3] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412.

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

3

be objectively unreasonable, not just incorrect or erroneous.[7]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[8]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

In applying this standard, this Court reviews the last reasoned decision by the state court.[12]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the

---

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

petitioner rebuts this presumption by clear and convincing evidence.[13]  This presumption applies

to state trial courts and appellate courts alike.[14]

IV.  DISCUSSION

Ground 1:  Breach of Plea Agreement

Rodgers argues, citing, *inter alia*, Cal. Penal Code, § 3041(a) and Cal. Code of

Regulations, title 15, § 2000(a)(67), that the objectively reasonable intent and understanding of

the parties to the plea agreement was that he would serve a minimum term of imprisonment, less

post-conviction credits for good conduct, and then be paroled.  The Riverside County Superior

Court rejected Rodgers's argument, holding:

> [Rodgers] correctly notes that a criminal defendant has a due process right
> to enforce the terms of his plea agreement in accordance with state contract law.
> (see *Buckley* v. *Terhune* (9th Cir. 2006) 441 F.3d 688 and cases cited therein.)  To
> that end, [Rodgers] argues that his plea agreement to second rather than first-
> degree murder impliedly meant that he would be released after serving the
> minimum term of confinement.  [Rodgers] has not provided the sentencing
> transcript for this court's review, but instead relies upon the probation report and
> his trial counsel's sentencing memorandum.  Unlike those cases wherein the plea
> agreement was ambiguous or specified a term different than that imposed, here
> there is no such ambiguity.  Where no ambiguity exists, the court may not
> consider extrinsic evidence.  As such, the court must look to the plain meaning of
> the plea agreement's language.  Based upon the record provided, this court finds
> that the plea agreement clearly imposed a sentence of fifteen years to life with the
> possibility of parole.  No additional promises or terms were provided in the plea
> agreement.  The fact that [Rodgers] understood he would be eligible for parole
> does not translate to an implied additional agreement that the parole eligibility
> would be awarded after he served a minimum term of confinement nor that the
> Board be precluded from considering the commitment offense when determining
> parole eligibility.[15]

---

[13] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[14] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[15] Docket No. 13-5, pp. 2-3.

It is well settled that a plea agreement is a contract that must be honored by the state.[16]  In this case, however, Rodgers reads his "contract" too broadly.  The proper interpretation and effect of the agreement between the State of California and Rodgers in this case is a matter governed by California contract law.[17]  What Rodgers received in exchange for his guilty plea was a sentence of 18 years to life,[18] with a *possibility* of parole at some point after he had served his minimum term.  What Rodgers overlooks is that his sentence was for life, not just 18 years.  Under California law, there is no guarantee of parole after a specified period of time, only that a prisoner will be considered for parole and granted parole *only if*, in the exercise of the discretion of the Board applying factors specified by regulations, he or she is found suitable for parole.[19]  Although the plea colloquy is not included in the record before this Court,[20] Rodgers does not allege that there was any promise, actual or implied, of when or under what terms or conditions he might be granted parole, only his "settled expectation" that he would be.  "A plea agreement violation claim depends upon the actual terms of the agreement, not the subjective understanding

---

[16] *See Santobello v. New York*, 404 U.S. 257, 262-63 (1971).

[17] *Ricketts v. Adamson*, 483 U.S. 1, 6 n.3 (1987).

[18] Because the maximum statutory term is life, contrary to Rodgers's argument, the principles and holdings of *Blakely v. Washington*, 542 U.S. 296 (2005), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), are not implicated.

[19] *Cf. In re Lowe*, 31 Cal. Rptr.3d 1, 13 (Cal. App. 2005) (holding that when a defendant enters a guilty plea, he has no reasonable expectation regarding the identity of the person or persons who would exercise discretion in evaluating his suitability for parole, or that the person or persons would not change over time, citing *Rosenkrantz*, 59 P.3d at 193).

[20] The Probation Officer's Report submitted with Rodgers's habeas corpus petition in the Riverside County Superior Court cryptically states under the heading "Specification of Plea": "Stipulated sentence 15 years to life plus three years for enhancement."  Docket No. 13-3, p. 12.

of the defendant . . . ."[21]  Nor does Rodgers argue that any such agreement, if one did exist,

would be enforceable under California law.

Accordingly, based upon the record before it, this Court cannot say the decision of the

Riverside County Superior Court in this case that denial of parole did not breach Rodgers's plea

agreement was "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or was "based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[22]  Rodgers is not entitled to relief under his first ground.

Ground 2:  Sufficiency of the Evidence

In denying Rodgers parole, the Board held:

> **PRESIDING COMMISSIONER BIGGERS**:  Thank you.  In the case of
> Mr. Kenneth Rodgers, CDC number J-35303, the panel has reviewed all
> information received from the public and relied on the following circumstances in
> concluding that the prisoner is not suitable for parole and would pose an
> unreasonable risk of danger to public safety if released from prison.  The first
> thing the panel looked at, sir, was the commitment offense, and we felt that the
> offense was carried out in an especially brutal, cold-blooded and calculated
> manner in that you shot and killed your wife Miss Rochelle Rodgers, age 21,
> during the period of time that the two of you were separated and she had indicated
> that she was seeing another person.  We also felt that this offense was done in a
> manner which demonstrated a callous disregard for human suffering in that she
> was very vulnerable sitting in her car and you ended up shooting her three times as
> she sat there in her vehicle.  The motive for the crime was very trivial in that it
> appears that it was anger and jealousy over the fact that she was seeing somebody
> else.  These statements of the crime, the commitment offense, were taken from the
> Statement of Fact in the Probation Officer's Report where it states that on the
> morning of the offense that you followed -- as she was getting off from work, she
> went to her friend's home on 668 64th Street.  You followed her there, and you
> subsequently shot and killed her while she was sitting in her vehicle in the

---

[21] *In re Honesto*, 29 Cal. Rptr.3d 653, 660 (Cal. App. 2005).

[22] 28 U.S.C. § 2254(d).

driveway of the residence.  She had just recently got off from work and gone to her brother's residence where she'd been staying, and then she left that morning and went to her friend's house and that's where you went over (inaudible).  The panel looked at your history of tumultuous relationships with others --

      **ATTORNEY CURREY:**  Are we on the record, Commissioner?  I'm sorry, are we on the record?

      **PRESIDING COMMISSIONER BIGGERS:**  Yes, we are.

      **ATTORNEY CURREY**:  (inaudible).

      **PRESIDING COMMISSIONER BIGGERS:**  We're on the record. We're definitely on the record. Your relationship with others in that it appeared that you have some issues, especially when it comes to individuals that you have dated and broken up with.  You seem to not handle that pretty well because even as we were talking and going through the hearing, you were talking about your -- the way that you like to try to control people.  Your prior criminality involved a lot of that where it showed that you were trying to control individuals, and it goes all the way back to 1985 where you were asked to leave -- you went over to an ex-girlfriend's house and you refused to leave when her father requested that you leave, and then when the police came over to move you from the premises, you got into a physical altercation with them.  You also had a history of domestic violence from family violence that was shown in 1986, and into that a little bit later on as we get done with your decision.  The psychological evaluation that was done on December the 19th, 2006, authored by Dr. Davis, was in fact supportive. He indicated -- and I'm looking on page 6 -- that he felt that you were -- it said, given your recorded history in the files review and from the interview, it appears to show that you have a low risk of dangerousness and violence when compared to other life term inmates.  This is where the inmates are within the CDCR or are on/parole, so it was a very favorable report.  On your parole plans, you don't have any.  You have a lot of support letters from family members that are in Texas. You have no -- and what you need to do, if that's where you really want to go, is you need to start going through and determining what is necessary.  You need to take those steps to find out what is necessary for you to get a transfer to Texas and take care of all of the necessary paperwork and get the okay.  In the event that they say no, then you're going to have to figure out a way to get something started here in California.  Now because of the support that you have, there was some indication in there and in talking to you, that some of your family members then after your wife had separated from you and she told you that she was seeing somebody else, you went over to the restaurant where she worked and you ended up slapping her and also at that time slapping the individual that she was going out with.  There was also in the record that you had an altercation with the victim's brother, where there was an attempt made which you were -- as they put it, you were assaulted with another vehicle.  So you really had a problem with either ladies breaking up with you, women breaking up with you because you were not able to control them and you wanted to take them back and they didn't

want to go.  You have, however, programmed very well.  You have gotten your GED, you have a vocational Masonry, and you are moving towards another vocation in Landscaping.  You have eight self-help programs you've attended. There's Anger Management in '04.  You've been involved with AA from '95 until 2006, and actually 2007 because the quarter is not over yet and you haven't gotten any chronos on that.  But also for Breaking Barriers, Relationship Awareness programs. You got a correspondence course on Stress Management that you took, and you also are involved with another one, Criminon West, which you are in the process of doing.  So you've done a lot of self-help, and as we get a little bit further into the decision, you're going to [*sic*] commended for that, but we want you to make sure that you continue to move down that path.  You also have done very well, and you haven't been a management problem within the institution. You have five 128 counseling chronos and only one serious 115, when that was for manufacturing of pruno back in '95, which is another indication that you really -- and I'm glad to see that you are staying with AA because it appears that after you got that chrono in '95, that's when you really got involved with AA participation.  You also mentioned the fact that you have gotten into some trouble in the county jail over pruno as well, because you took a sip of that when you were there.

     **INMATE RODGERS**:  (inaudible)

     **PRESIDING COMMISSIONER BIGGERS:**  Okay. But the fact of the matter, you were still involved with alcohol, and alcohol seems to be a problem with you, and you should really take whatever you learn in there and start applying it to everyday life and maybe that will help you, and I'll get into that a little bit later on as we get done with your decision. The psychological evaluation that was done on December the 19th, 2006, authored by Dr. Davis, was in fact supportive. He indicated -- and I'm looking on page 6 that he felt that you were -- it said, given your recorded history in the files review and from the interview, it appears to show that you have a low risk of dangerousness and violence when compared inmates are within the CDCR or are on parole, so it was a very favorable report. On your parole plans, you don't have any.  You have a lot of support letters from family members that are in Texas.  You have no -- and what you need to do, if that's where you really want to go, is you need to start going through and determining what is necessary.  You need to take those steps to find out what is necessary for you to get a transfer to Texas and take care of all of the necessary paperwork and get the okay.  In the event that they say no, then you're going to have to figure out a way to get something started here in California.  Now because of the support that you have, there was some indication in there and in of your family members indicate they would come back up here and get their business started (inaudible) or something, if you had to parole back here to California, and that's all well and good, but it would help whoever's on the panel to know that if they're here and they have a business started already, it would look a lot better for you if they already have their business going so as not to say that you're going to

come our here and get a business started.  Do you understand what I'm telling you?

      **INMATE RODGERS:**  Yes, sir.

      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  But you do have marketable' skills, and those skills are in Masonry, and again, something that you're working towards right now in Landscaping.  We do note on the 3042 responses that the District Attorney of Riverside County voted -- I mean, indicated an opposition to a finding of parole suitability.  We also had two opposition letters from friends of the victim who indicated that they had an opposition to a finding of parole suitability.  You're moving in a positive direction, Mr. Rodgers, however, you really need to understand and figure out what those causative factors were that led you to commit this offense.  I know you said that it was anger and you said also that it was anger, alcohol and jealousy, but there's got to be something else that caused you to do that because if you go back, on all of your relationships, you still seem to have the same problem when they break up with you.  And you were saying that your wife  [Thereupon, the tape was turned over.]

      **DEPUTY COMMISSIONER MOORE:**  Side two of tape two.

      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Again, as I was saying before, you need to come to grips with what's causing you to be like that.  It's more than just anger and jealousy and rage, you don't handle stress very well.  And one of the things that the Deputy Commissioner and I talked about was, you know, you were having a lot of stress when this was going on.  but [*sic*] at the same time, you need to realize that you can't always handle this is [*sic*] a destructive manner. You were upset with your wife because of all the stuff that was going on, you went down there and you slapped her.  Then you went over to another girlfriend's house and they asked you leave and you didn't want to leave.  So again, you need to come to grips with what's causing you to be like that, and the only way you can do that is to get into these programs that we talked about earlier, and continuing those programs, where you can try to comes [*sic*] to grips with those causative factors that's causing you to be the way you are.  So the panel finds that you really need to come to understand and discuss, and understand and cope with the stress in a nondestructive manner.  Nevertheless, we want to commend you for, and I'm going to ask the Deputy Commissioner to do that, please.

      **DEPUTY COMMISSIONER MOORE:**  I'll have some times to say afterwards, but there's a number of things to commend you for.  The first is all of the laudatory chronos, the excellent work ethic that you exhibited, all of the people that have been your instructors or that you've worked with, all speak very highly, not only of the quality of your work but also the type of man that you are while you're employed for them and doing your job, and you are to be commended for that.  You really took to heart a lot of what the Board told you back three years ago, about getting into continuing with your AA and getting into all the self-help areas that you can get into.  Anger Management, Stress

10

Management, Relationship Awareness, you've done those things.  As we indicated earlier, we reviewed all of these things, the laudatories, all of the self-help programs, and for these you're to be commended.  Also I do want to commend you for not having any 115s for the past 11-plus years.  You're not supposed to have them, we don't see a lot of inmates before us who don't get them, and you've done well 11 years.  You have some counseling chronos.  They're very -- we've talked about them, the window covering and the cellee, (inaudible).  That's an awareness for reality, it's challenging, but you've done it, and we encourage you to continue.  And if the opportunity shifts for you to go from vocational training into a position for pay while you have to wait for more vocational, if that occurs, to accept it willingly, as you've accepted everything else so well and put your best efforts into it.  All of these things you are to be commended for.

       **PRESIDING COMMISSIONER BIGGERS**:  Okay.  However, these positive aspects of your behavior do not outweigh the factors of unsuitability.  In a separate decision, the hearing panel finds that it's not reasonable to expect that parole would be granted at a hearing during the following two years.  The offense was an especially cruel offense in that you shot and killed the mother of your two children, Rochelle, who was very vulnerable, after you had been drinking and through jealousy, anger, rage or whatever.  The fact of the matter is, she lost her life, someone that had borne your two children, because of you, no one else but you.  The offense was carried out in a manner which demonstrated a callous disregard for human suffering.  You shot her three times while she was sitting in her car.  She was extremely vulnerable, as I said before.  And lastly but not least, before I ask Deputy Commissioner Moore for her comments, is that you appear to have this tumultuous relationship with others for quite some time, and I talked about it briefly when I mentioned the other relationships that you had had before, where you became violent with people when they did not allow you to control them, and that's something that you're really going to have to get a handle on and demonstrate to any panel that you really understand why those causative factors (inaudible) Deputy Commissioner Moore?

       **DEPUTY COMMISSIONER MOORE:** Mr. Rodgers, you're on the path, you're on the right path.  This is a positive hearing that you had today.  I do want to make one communication for the record, as it will be written up, is the district attorney made a statement about are you drunk, were you drunk, and failed to put the last word on that sentence, and the question was "now," and that was when you were being questioned by the detective, and it was, "Were you drunk now" as opposed to earlier, and you said no.  I think it's important to get that complete part of that sentence be placed in the record, and also can be looked at the district attorney's submission on page 5 of your statement taken by the detective.  Coming back to what you need to do in the next two years, it's continuing to grow.  You have a lot of knowledge about being self-centered, afraid, controlling, and those are a lot of words that you've come to hear and try

and grasp an understanding of, but there's something that has to go from up here, where you understand it intellectually, to dropping down to into the center of your chest, into where it counts, and AA is really good in your head, but until you incorporate this and bring to bear, you're going to have to work with another man. I don't know how you're going to do that, but you have to work with a sponsor. You're going to have to, you know.  If you are as successful and feel as good as you say you do in AA, you're going to have to do a fifth step with another man, whether it's a chaplain or another man in the program with you here at Solano, or a sponsor that you obtain on the outside.  They can give you the direction of what it is you need to do next within the steps of Alcoholics Anonymous to continue to develop this path.  Your children indicate that they love you and care about you. It's a big difference one day dad then comes back into their life and dad's the one that killed mom.  There are amends to be made, and certainly you've been talking about living amends, but there's also an acknowledgment of what you were, what you did, and what you are like at now, and to carry that message not only to the other men that you live with here who are suffering from the disease of alcoholism, but to your family at large.  You have done many things.  If you have the opportunity to participate in a victim impact program, get on the waiting list for VORG.  Are you on it?

      **INMATE RODGERS**:  Yes, I'm researching VORG right now.

      **DEPUTY COMMISSIONER MOORE**:  Good.  Okay.

      **INMATE RODGERS**:  (inaudible) the waiting list.

      **DEPUTY COMMISSIONER MOORE**:  I think there is another program.  It depends on what yard you're on.  But any victim impact program where you can bring to bear the knowledge that you have and let it sink down, because as you have said, you're a closed off man.  Trust issues, certainly understandable in the prison situation.  But you're going to have to show a panel about your ability to be vulnerable in healthy ways, and you haven't shown it.  It takes more than what you have done and it's a path you are going to have to follow.  You are on the right path.  So take this as a positive hearing but know you still have a lot of work for society to believe that they will be safe if you are released.

      **INMATE RODGERS**:  Thank you.

      **DEPUTY COMMISSIONER MOORE**:  Okay.  Thank you, Commissioner.

      **PRESIDING COMMISSIONER BIGGERS**:  Okay.  the panel is going to recommend that you remain disciplinary free, continue to grow, as Deputy Commissioner Moore mentioned, both vocationally and educationally as well, and continue to participate in self-help programs.  That concludes the hearing. The time is now 11 minutes to three.  Good luck to you, Sir.[23]

---

[23] Docket No. 13-9, pp. 51-65.

Rodgers argues that the determination that he currently poses an unreasonable risk of danger to society is unsupported by any relevant reliable evidence.  In denying Rodgers's petition for habeas corpus relief, the Riverside County Superior Court simply held: "Having reviewed the entirety of the parole hearing record before the Board of Prison Terms, this court finds the Board's parole denial is based on some evidence and that there was no breach of Petitioner's plea agreement.  Therefore, the Petition is DENIED."[24]

In its response, the State advances several arguments, all of which have the same general theme: the Ninth Circuit's decision in *Hayward* was wrongly decided and, under AEDPA, this Court is limited to determining whether the California procedure complies with the requirements of the Supreme Court in *Greenholtz*.[25]  The State's suggestion that this Court disregard the specific holding of the Ninth Circuit in *Hayward* is directly contrary to the command of the Ninth Circuit.  Under the "law of the circuit," a district court is bound by a decision of a three-judge panel unless and until it is either expressly overruled by, or is clearly irreconcilable with, an intervening decision by an en banc panel of the Ninth Circuit, the Supreme Court or legislation.[26]  *Hayward* is itself an en banc decision reflecting the "law of the circuit," which this Court lacks the authority to disregard.  In addition, the States's arguments have been rejected and are foreclosed by the Ninth Circuit decision in *Pearson v. Muntz*.[27]

---

[24] Docket No. 13-5, p. 3.

[25] The State does not even attempt to address application of the California some evidence standard by pointing to evidence in the record that supported the finding that Rodgers posed a current threat to public safety.

[26] *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).

[27] 606 F.3d 606 (9th Cir. 2010) (per curiam).  This Court notes, with some degree of

(continued...)

This Court must decide the case on the law as it exists at the time it decides the case and, if the law changes while the case is pending, this Court applies the new rule.[28]  Thus, although it establishes a new rule, the holding in *Hayward* is controlling.  In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the facts in light of the evidence.'"[29]  By its reference to § 2254(d), the Ninth Circuit implicitly, if not explicitly, directed this Court to apply § 2254(d) to the decisions of the California Supreme Court using the same standards as are applied to the determination of the law as established by the United States Supreme Court.  Accordingly, under the mandate of *Hayward*, this Court must canvas and apply California law under the standard of review stated in Part III, above, as it existed at the time of the state court decision to the facts in the record as presented to the state court

Under the mandate in *Hayward* this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state court decisions.  This is in tension with holdings of the Supreme Court.  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[30]  A

---

[27](...continued)
displeasure, that the State cited *Pearson* but did not discuss it or provide any nonfrivolous argument for the inference that this Court should disregard it.  *See* Fed. R. Civ. P. 11(b)(2).

[28] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

[29] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

[30] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S.
(continued...)

fundamental principle of our federal system is "that a state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court

sitting in habeas corpus."[31]  This principle applied to federal habeas review of state convictions

long before AEDPA.[32]  A federal court errs if it interprets a state legal doctrine in a manner that

directly conflicts with the state supreme court's interpretation of the law.[33]  It does not matter that

the state supreme court's statement of the law was dictum if it is perfectly clear and

unambiguous.[34]

At the time of the decisions of the Board and the sate courts in this case, the California

"some evidence" rule was embodied in *Rosenkrantz* and *Dannenberg*.  Subsequently, the

California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In re Lawrence*[35] and

*In re Shaputis*.[36]

_____

[30](...continued)
639, 653 (1990) (it is presumed that the state court knew and correctly applied state law),
*overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*,
456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not
allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455
(2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[31] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236
(1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has
spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[32] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate
expositors of state law").

[33] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio
Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence
was erroneous.").

[34] *Id.* at 76.

[35] 190 P.3d 535 (Cal. 2008).

[36] 190 P.3d 573 (Cal. 2008).

In *Rosenkrantz*, the California Supreme Court held:

> [. . . .]  Due process of law requires that [the Board's] decision be supported by some evidence in the record.  Only a modicum of evidence is required.  Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board].  [. . . .]  [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . .  It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.  As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[37]

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.)  Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.  [. . . .]
>
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ."  (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted.  Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)  [¶]  Therefore, a life term offense or any other offenses underlying an

---

[37] *Rosenkrantz*, 59 P.3d at 218.  Quoted with approval in *Shaputis*, 190 P.3d at 585.

indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[38]

In *Dannenberg* the California Supreme Court explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[39]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation.  Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[40]

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[41]  The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction

---

[38] *Id.* at 222; *see Shaputis*, 190 P.3d  584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety.") (emphasis in the original).

[39] *Dannenberg*, 104 P.3d at 795.

[40] *Id.* at 803.

[41] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

evidences."[42]  In *Lawrence*, the California Supreme Court rejected the argument "that the

aggravated circumstances of a commitment offense inherently establish current dangerousness,"

holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[43]

With respect to the underlying commitment offense, the applicable regulation provides:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>     (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>     (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>     (C) The victim was abused, defiled or mutilated during or after the offense.
>     (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>     (E) The motive for the crime is inexplicable or very trivial in relation to the offense.[44]

The Board denied parole based upon essentially two factors:  (1) the gravity of the

underlying offense, in particular what the Board considered the vulnerability of the victim, the

dispassionate, cold-blooded, deliberate character of the offense and the triviality of the motive;

---

[42] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[43] 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

[44] Cal. Code Regs., tit. 15, § 2402(c).

and (2) the tumultuous relationship with others.[45]  Both are factors that may be considered by the

Board as demonstrating unsuitability for parole.  However, the circumstances of a commitment

offense, standing alone, cannot constitute evidentiary support for the denial of parole.  The record

also must "'establish[] that something in the prisoner's pre or post-incarceration history, or his or

her current demeanor and mental state, indicates that the implications regarding the prisoner's

dangerousness that derive from his or her commission of the commitment offense remain

probative to the statutory determination of a continuing threat to public safety.'"[46]

Rodgers's pre-incarceration criminal history shows several arrests, but no convictions: (1)

criminal trespass and resisting arrest when he refused to leave a girlfriend's house (1985); (2)

criminal mischief when he damaged a parked vehicle while driving under the influence (1985);

(3) unlawfully carrying a weapon (a broken wheel barrow handle); and (4) family violence (an

altercation with his mother over Rodgers's drinking) (1986).[47]  All of these arrests appear to have

been alcohol related.[48]  In addition, the record shows the Board considered three non-arrest

incidents occurring in 1992:  (1) a restraining order for slapping his wife; (2) an incident where

he allegedly hit the brother of his estranged wife's boyfriend with a vehicle in a parking lot;[49] and

---

[45] Rodgers argues that the evidence supporting this factor was limited to arrest records
that did not result in criminal convictions.  Consequently, according to Rodgers, citing Cal. Penal
Code § 3041(b) and *Rosenkrantz*, 59 P.3d at 202-03, the Board erred in considering that
evidence.  Neither § 3041(b) nor *Rosenkrantz* require that the criminal history be limited to
convictions or preclude the Board from relying on arrest records.

[46] *Cooke*, 606 F.3d at 1216 (quoting *Lawrence*, 190 P.3d at 555).

[47] Docket No. 13-9, pp. 63-66.

[48] Rodgers started using alcohol at age 12, which continued until his incarceration.
Docket 13-9, pp. 95-96.

[49] The details of this incident are contained in the Police Report, which reveals widely
(continued...)

(3) an allegation that Rodgers had told the victim's brother that he (Rodgers) would shoot the victim if she ever messed with him.[50]

Post-incarceration, Rodgers received one serious 115 for use of pruno (an inmate-manufactured alcohol concoction) in 1995.  Since that time Rodgers has been discipline-free.  While incarcerated Rodgers has received his GED and a vocation in masonry, and was moving towards another vocation in landscaping.  Rodgers has attended eight self-help programs including anger management, stress management, relationship awareness programs, and has been continuously involved with AA from 1995.

Rodgers's pre-incarceration history, other than the underlying commitment offense, although showing some degree of violent behavior, all tied to the use of alcohol, did not involve a risk of serious bodily injury or death.  This history does not suggest or raise an inference that he poses a *current* danger to society.  Nothing in his history during his time in prison supports a finding that Rodgers poses a current threat to public safety; no testimony, report, or other evidence regarding a hostile demeanor; and no indication of a disturbed mental state or a mental state that would otherwise suggest current dangerousness.  No evidence supports the observation that something other than rage, jealousy, and alcohol caused Rodgers to kill his wife, or that Rodgers does not presently understand the causative factors for his violent reaction when people did not allow Rodgers to control them.  The finding that Rodgers really needs to come to

---

[49](...continued)
disparate descriptions of the incident by the victim and Rodgers.  Docket 13-2, pp. 57-59.  It does not appear that criminal charges were filed.

[50] Docket No. 13-8, pp. 66-68.

understand, discuss and cope with stress in a nondestructive manner finds no support whatsoever in the record.

Under California law, judicial review of a decision denying parole is "extremely deferential."[51]  As the California Supreme Court has noted:  "The Board's discretion in parole matters has been described as great and almost unlimited."[52]  It is through this doubly deferential lens that this Court reviews the decision of the Riverside County Superior Court.  This deference notwithstanding, this Court must nonetheless review the state court decision to determine if "it was based on an unreasonable determination of the facts in light of the evidence."[53]  Both the subsidiary findings and the ultimate "some evidence" finding constitute factual findings.[54]

Assuming the validity of the Board's findings as to the circumstances of the commitment offense,[55] under *Rosenkrantz* and *Dannenberg*, this Court could not say that the decision of the Riverside County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.   On the other hand, if *Lawrence* and *Shaputis* are applied, then the decision of the Riverside County Court in this case was clearly contrary to, or involved an

---

[51] *Rosenkrantz*, 59 P.3d at 210.

[52] *Id.* at 203 (internal quotation marks and citations omitted).

[53] *Cooke*, 606 F.3d at 1216.

[54] *Id. at* 1208 n.2, 1216 (citing *Hayward*).

[55] This Court is extremely skeptical that the crime, one of passion, triggered by anger and jealousy while under the influence of alcohol, was especially brutal, cold-blooded and calculated within the scope of Cal. Penal Code § 2402(c).  *See Shaputis*, 190 P.3d at 582 n.15; *Pirtle v. California Board of Prison Terms*, 611 F.3d 1015, 1021–22 (9th Cir. 2010).  The motive in this case, jealousy, was hardly trivial.  *Id.* at 1022.  In addition, the Board's characterization that the victim, sitting in a car, was particularly vulnerable, or that it showed a callous disregard for human life would fit most any murder committed in a fit of anger against an unarmed victim.

unreasonable application of California law and an unreasonable determination of the facts in light of the evidence.

The Board's findings *vis-a-vis* the underlying commitment offense would be sufficient under *Rosenkrantz* and *Dannenberg*.  They are not sufficient under *Lawrence* and *Shaputis* as interpreted by *Hayward*, *Pearson*, and *Cooke*.  What the Board did not do, and the State expressly declined to do, is explain how events ending in 1992 show that Rodgers presented a significant risk to public safety in 2007, rendering the determination of current dangerousness insufficient under *Lawrence* and *Shaputis*.  Thus, under *Hayward*, *Cooke* and *Pirtle*, this Court is compelled to find that the Board's denial of parole violated Rodgers's liberty interest protected by the Due Process Clause of the Fourteenth Amendment.[56]

## V.  CONCLUSION AND ORDER

Rodgers is entitled to relief on the second ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **GRANTED**.

**IT IS FURTHER ORDERED THAT** the denial of parole is vacated and this matter is remanded to the California Board of Parole Hearings for further proceedings consistent with the decisions of the California Supreme Court in *In re Lawrence*, 190 P.3d 535 (Cal. 2008), and *In re*

---

[56] In reaching this conclusion, this Court is mindful of the following significant problems: (1) the applicability of *Lawrence* and *Shaputis* to cases in which the state court decision became final prior to August 21, 2008; and (2) the appropriate scope of review by federal courts in federal habeas proceedings under 28 U.S.C. § 2254(d) of the application by the California courts of the California "some evidence" rule.  In other words, to what extent may subsequent California cases modify the "liberty interest" established by California law and recognized in *Hayward*, *Pearson*, and *Cooke*.

*Shaputis*, 190 P.3d 573 (Cal. 2008),[57] as interpreted by *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc),  *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam), *Cooke v. Solis*, 606 F.3d 1206 (9th Cir. 2010), and *Pirtle v. California Board of Prison Terms*, 611 F.3d 1015 (9th Cir. 2010).

**IT IS FURTHER ORDERED THAT**, if the Board of Parole Hearings has not held a hearing within 120 days of the date of entry of this Order, the Secretary of the California Department of Corrections and Rehabilitation must release Rodgers to parole status.

The Clerk of the Court is to enter final judgment accordingly.

Dated:  January 7, 2011.

_____/s/ James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
United States District Judge

---

[57] *See In re Prather*, 234 P.3d 541, 550-54 (Cal. 2010); *Haggard v. Curry*, --- F.3d ---, 2010 WL 4015006 (9th Cir. October 12, 2010).

23